# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                               )
BILL FIFE,                     )
                Plaintiff,     )
                               )
    v.                         )          Civil Action
                               )          No. 17-11387-PBS
METLIFE GROUP, INC. and METLIFE, )
INC.                           )
                               )
                Defendants.    )
_____)
```

## MEMORANDUM AND ORDER

November 15, 2019

This is an age discrimination suit brought by Plaintiff
Bill Fife against Defendants MetLife Group, Inc. and MetLife,
Inc. (collectively, "MetLife"). Fife alleges MetLife terminated
his employment because of his age during a reduction in force in
2016 after fourteen years of strong performance. Fife brings
claims of age discrimination under the federal Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et
seq., and the Massachusetts Fair Employment Practices Act
("FEPA"), Mass. Gen. Laws ch. 151B. After a hearing and review
of the record, this Court denied MetLife's first motion for
summary judgment on June 4, 2019 (Docket No. 89). The Court
found that there are genuine disputes of material fact as to
whether MetLife considered Fife's proximity to retirement when
terminating him at the age of sixty-four. The Court assumes

familiarity with that opinion and will not revisit the issues addressed in it.

During discovery, Fife learned that MetLife had considered Fife for a newly created position rather than terminating him, but ultimately didn't offer it to him. At Defendants' request, the Court permitted targeted discovery regarding this position (Docket No. 90). Following this discovery, MetLife has filed a renewed motion for summary judgment and the parties have submitted an avalanche of filings on this second bite of the apple. After a hearing, the Court **DENIES** Defendants' renewed motion for summary judgment (Docket No. 96).

## FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the non-moving party, the record contains the following facts.

### I.   Fife Hired by MetLife

Bill Fife was hired by Travelers, an insurance company, in 2004. Fife became a MetLife employee in 2005, when MetLife acquired Travelers. In 2014, Fife was named Vice President of Strategic Relationship Management ("SRM") & Divisional Sales Manager ("DSM") for HSBC (a bank). As part of his SRM role, Fife supervised Eric Tompkins, who in turn supervised eight SRM employees. From February 2014 to February 2016, Fife reported to Kieran Mullins, who was then the Senior Vice President of Life

and Disability Sales Third Party. In February 2016, Mullins was promoted, and Myles Lambert became Fife's direct supervisor.

The Defendants have acknowledged that Fife was "always a strong performer." Docket No. 119 at 24. For example, in Fife's 2014 performance assessment, Mullins described Fife as having an "outstanding year in 2014," Docket No. 119 at 33, in which Fife "exceeded sales goals," id. at 29, and created new work practices which Mullins said would "be the cornerstone of our strategy for years going forward," id. at 32.

## II.  Fife's Retirement-Related Discussions Prior to 2016

Prior to December 2015, Fife told Mullins that he had planned to retire around age sixty-five. However, in December 2015 or January 2016 he told Mullins that, because he was enjoying work and achieving good results, he had "no interest in retiring at 65" and wanted "to keep going." Docket No. 99-8 at 7 (Fife II Tr. 43:19-44:16).

Both Lambert and Tompkins believed Fife had retirement plans as of the spring of 2016. Lambert "was told" in the spring of 2016 about Fife "relinquishing some of his responsibilities to [Tompkins], in preparation of eventually transitioning into retirement." Docket No. 114 at 52 (Lambert Tr. 42:14-43:4). Tompkins claims Fife commented "on several occasions about his retirement plans," as late as December of 2015, Docket No. 114 at 15 (Tompkins Tr. 46:1-8, 46:19-24, 48:5-12), but Fife denies

3

ever discussing the issue with Tompkins, Docket No. 111 at ¶ 4. Tompkins further stated that in 2016 "there was a known quantity that Mr. Fife intended to retire at some point in time." Docket No. 114 at 15 (Tompkins III Tr. 46:1-8).

### III. MetLife Spins Off U.S. Retail Life Insurance Business into Brighthouse Financial, Inc.

In late 2016, MetLife spun off a portion of its U.S. retail business into a new company, Brighthouse Financial, Inc. Unlike MetLife's model of selling numerous insurance products through an insurance agent sales force, Brighthouse would initially focus on offering a smaller portfolio of insurance products through sales by third parties.

MetLife conducted a reduction in force ("RIF") and reorganization of leadership prior to the spin off of Brighthouse. In early 2016, Mullins was promoted, and Myles Lambert became Fife's direct supervisor. A few months later, on June 6, 2016, Lambert appointed Melissa Cox as National Sales Director for Third Party Distribution, making her Fife's direct supervisor.

### IV. Reduction in Force

Lambert convened an offsite meeting around March 2016, which Tompkins, Cox, and Lauren Davis (a DSM) attended. According to Tompkins, the purpose of the meeting was to "start thinking what the new organization might look like,"

specifically for the third-party life insurance team. Docket No. 114 at 12 (Tompkins III Tr. 38:20-39:8). Tompkins signed a non-disclosure agreement regarding his work with Cox and Davis. MetLife employees Barry Higgins and Gretchen Bell were later added to the group. By July 13, 2016, there was a "core group which was the team of people that were looking at how we were going to structure distribution and strategically what we were going to do moving forward." Id. at 6 (Tompkins III Tr. 15:20-23).

In preparation for the transition to Brighthouse, Cox was tasked with decreasing the DSM headcount down to three. Cox did not review any of the DSM's prior performance reviews or sales metrics to assist her in deciding whom to retain. She also did not consult with Mullins, Fife's prior supervisor. at 11, 45 (Cox I Tr. at 33:8-20, 172:6-21). Cox explained that she wanted to "do [her] own due diligence and create [her] own perspective." Docket No. 116 at 45 (Cox I Tr. at 172:10-12).

Cox did discuss her direct reports with Tompkins. Cox solicited Tompkins' thoughts on Fife during an in-person conversation during the summer of 2016. (Cox Tr. I 157:3-158:10). According to Cox, during that conversation Tompkins said he "felt micromanaged, uncomfortable, felt like he had no means to progress in his career" because of Fife. Docket No. 116 at 42 (Cox Tr. I 157:5-7).

**V.    Termination Timeline**

**A.    June 2016**

On June 9, Cox conducted a thirty-minute phone call with Fife. Cox felt that Fife was "making himself the center of attention," during the call, as she says is reflected in the words "prove, prove prove – look at me!" in her notes. Docket No. 70 at 24 (Cox II Tr. 11:19-12:13).

On June 20, Tompkins emailed Lambert with a proposal for Brighthouse's SRM team. Tompkins' email identified several individuals who "st[ood] out as good fits" for the SRM team. Docket No. 98-1 at 2. Fife was listed first, with the notation "Firm Recruitment (maybe short term time horizon based on stated retirement ambitions—if so, would look to have him working closely with identified successor)." Id. That same day, Cox and Lambert conducted a phone call. Cox's notes from the call list "Fife-consultant 10k mo" under the header "DSM." Docket No. 45-12 at 10.

The next day, on June 21, Cox conducted a meeting with the DSMs. In a later deposition, Cox found Fife to be "aggressive," "forceful," and "bullying" during this meeting. Docket No. 116 at 17 (Cox I Tr. 57:11-21, 59:24). She claimed that Fife interrupted his colleagues and tried to make himself the center of attention. After the meeting, Cox texted Tompkins, "I do want to tell you about Rovner and fife given your prelim plan . . . I

6

don't think my comments on fife will be any surprise. You will just have to rule with an iron fist." Docket No. 62-4 at 28-29. Tompkins responded "Fife could help me get someone else ready." Id. at 29.

The following day, on June 22, Fife and Tompkins had a phone call. Tompkins asked Fife if it would be his preference to continue his work with HSBC (which fell under Fife's responsibilities as a DSM). Tompkins also told Fife that a potential role on Tompkins' team could include "focus on training and developing [an] eventual successor." Docket No. 62-4 at 17. The next week, on June 28, Cox texted Tompkins, "I'm on a call with hr right now discussing my leadership team. Where are you with bill and Ron?" Docket No. 62-4 at 20. Tompkins responded "Feeling better about Bill than Ron. Meeting with Myles Friday." Id.

### B. July 2016

Cox decided exclude Plaintiff from the DSM team in either June or July 2016. The precise date is disputed. During her first deposition, Cox stated that she had made the decision to terminate Fife in July 2016. Cox explicitly denied that she had made the decision in June 2016. However, in her second deposition Cox indicated that she had made the decision by June 20, 2016.

7

On July 6, a human resources employee at MetLife created a handwritten note labeled "Eric Tomkins 7/6/16" with the following phrases written underneath and in the margin: "Bill Fife—w/in retirement timeline? (12-18 mos.); "would need to select successor"; "Reports into Melissa now"; "Retirement benefits? Leave under Met or Newco?" Docket No. 45-21. The next day, Cox texted Tompkins and asked "What did you decide on Rovner and Fife?" Docket No. 62-4 at 32.

On July 12, Tompkins emailed Libby Jackson, a HR employee at MetLife. Tompkins asked if Jackson had any additional information following their discussion on Fife, to which Jackson responded, "the question remains how we'll handle his transition and how his retirement benefits will be impacted." Docket No. 45-16 at 2.

On July 13, Tompkins sent a colleague an organizational chart for his proposed SRM team. The chart included Fife, and did not include Jeffrey Dahn, who was ultimately employed by the SRM team. Cox created handwritten note dated the next day, July 14, that included the words "L3 timing - Ron/Fife" under "Eric 7/14/16." Docket No. 45-12 at 12.

On July 15, Cox email Tompkins, Lambert, and two individuals from HR. She wrote, "I've spoken with Eric and we agree that Lauren Davis, Bill Fife, and Ron Rovner should be considered for roles on his team." Docket No. 45-19. An HR

employee responded to everyone on the thread, stating "it puts everyone in a better position when we don't ask the employees to choose between roles." Id. Tompkins responded, "Confirming this is accurate from my perspective." Id.

On July 21, Tompkins texted Lambert asking if they could discuss his SRM team. That evening, Tompkins emailed HR employees chart of the SRM team that included Fife as the head of Firm Recruitment, with three unnamed employees below him. The next day, Tompkins sent Lambert's personal assistant an updated version of the chart that labeled one of the subordinates underneath Fife as "TBD- will need to take over in 18 months." Docket No. 98-7. In a later deposition, Tompkins stated that at this point, his organizational plans might have been different if he had thought Fife's retirement would occur later.

On July 24, Tompkins asked Fife via text to "think about who may be a solid pick for [Fife] to mentor to get ready for recruiting financial institutions." Docket No. 45-20 at 5. Tompkins made this request because there was "a known period of time where Bill had disclosed he had intended to retire." Docket No. 62-4 at 56 (Tompkins II Tr. 12:12-19). Both Fife and Tompkins discussed Dahn as a potential successor.

Cox created handwritten notes dated July 26 that included "Bill Fife – 18 mo - recruit & create replacement" under the header "SRM Team – Tompkins." Docket No. 45-12 at 13. The same

day, Tompkins emailed Lambert to say that Tompkins thought there was "an opportunity to get Fife a severance and pay him a consulting fee that [would allow them] to transition the HSBC relationship as well as the firm recruitment responsibilities over a 12-18 month period." Docket No. 98-9.

### C.    August 2016 and Aftermath

On August 2, Tompkins emailed Lambert, his assistant, and two HR employees with an organizational chart that did not include Fife. Jeffrey Dahn was listed in the position that Fife previously occupied, with a title change from "Firm Recruitment" to "Financial Institutions." Docket No. 98-10 at 3. Tompkins testified that he and Dahn "were going to work closely" on the job duties that Fife would have otherwise performed. Docket No. 114 at 25 (Tompkins III Tr. 90:5-10); Docket No. 62-5 at 8 (Tompkins I Tr. 99:14-21) (testifying that the "position changed in terms of its scope over time").

Tompkins testified that he ultimately decided against including Fife on the SRM team because he "couldn't afford" to pay Fife's salary, which at the time was more than $500,000 per year. Docket No. 114 at 25 (Tompkins III Tr. 89:6-23). Tompkins testified that he thought it would be "highly offensive" to ask Fife to take a pay-cut in order to join Brighthouse's SRM team. Docket No. 99-4 at 8 (Tompkins III Tr. 91:16-92:9).

Cox produced handwritten notes dated August 3 and labeled "Myles [Lambert], ET [Tompkins] & HR re: Creel & Fife." Docket No. 45-12 at 17. The notes appear to include points that were eventually included in Cox's typed script for Fife's termination.

Cox terminated Fife during a phone call on August 5. Later that day, Cox texted Tompkins asking him to draft talking points for Fife to transition MetLife's relationship with HSBC. Tompkins responded, "I thought we were going to give him some flexibility around how he wants to communicate the change." Docket No. 62-4 at 39. Fife's termination was effective as of December 31, 2016.

In early January 2017, MetLife provided Fife with a "Separation Agreement, Waiver, and General Release." MetLife stated that Fife could be eligible to receive severance payments in exchange for executing the document. The Defendants also sent Fife a document labeled "Disclosure Information Provided Pursuant to the Older Workers Benefit Protection Act [OWBPA]." The OWBPA document listed seven individuals, including Fife, stating that they represented "[a]ll employees in the impacted decisional unit." Docket No. 45-14 at 2. The list did not include Lauren Davis, Jordan Tell, Brandon Fisk, or Steve Sugumele, all of whom were considered by Cox for a DSM position at Brighthouse.

**DISCUSSION**

## I. <u>Legal Framework</u>

### A. Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." <u>Rivera-Rivera v. Medina & Medina, Inc.</u>, 898 F.3d 77, 87 (1st Cir. 2018) (quoting <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 23 (1st Cir. 2017)). A material fact is one with the "potential of changing a case's outcome." <u>Doe v. Trs. of Bos. Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018). "The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st Cir. 2018).

### B. Age Discrimination in Employment Act ("ADEA") and Massachusetts Fair Employment Practices Act ("FEPA")

The ADEA makes it unlawful for an employer to refuse to hire, to discharge, or to "otherwise discriminate" against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The statute "reflects a societal condemnation of invidious bias in employment decisions."

12

McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 357
(1995). Where no direct evidence of age discrimination is
available, single-plaintiff ADEA and Chapter 151B claims are
analyzed under the McDonnell Douglas burden shifting framework.
See Goldman v. First Nat'l Bank of Bos., 985 F.2d 1113, 1117
(1st Cir. 1993) (applying McDonnell Douglas Corp. v. Green, 411
U.S. 792, 802-05) (1973)).[1]

At the first step of the McDonnell Douglas framework, the
plaintiff must make out a prima facie case of age
discrimination. Del Valle-Santana v. Servicios Legales De Puerto
Rico, Inc., 804 F.3d 127, 129-30 (1st Cir. 2015). In a reduction
of force case, the plaintiff must show that (1) he was at least
40 years old, (2) his work met the employer's legitimate
expectations, (3) he experienced adverse employment action, and
(4) younger persons were retained in the same position or the
employer did not treat age neutrally in taking the adverse
action. Id. The burden the plaintiff bears is "not onerous," and
requires the plaintiff allege only enough to raise the inference
of discrimination. Cruz-Ramos v. Puerto Rico Sun Oil Co., 202
F.3d 381, 384 (1st Cir. 2000). Massachusetts law allows the

---

[1] The ADEA and Chapter 151B analyses are "substantially similar."
Adamson v. Walgreens Co., 750 F.3d 73, 83 (1st Cir. 2014); see
also Woodward v. Emulex Corp., 714 F.3d 632, 637-38 (1st Cir.
2013) ("Massachusetts has adopted the Supreme Court's approach
to employment discrimination." (citing Sullivan v. Liberty Mut.
Ins. Co., 825 N.E.2d 522, 530 (Mass. 2005)).

plaintiff to establish the fourth element by "producing some evidence that [his] layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 533-34 (Mass. 2005). The plaintiff's prima facie showing creates a rebuttable presumption of discrimination.

At the second step, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason" for the adverse action. Del Valle-Santana, 804 F.2d at 130. The burden is of "production as opposed to persuasion." Lewis v. City of Boston, 321 F.3d 207, 214 (1st Cir. 2003).

Finally, at the third step under the ADEA, the plaintiff "must produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination." Woodward v. Emulex Corp., 714 F.3d 632, 638 (1st Cir. 2013) (quoting Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1309 (Mass. 1997)); see also Del Valle-Santana, 804 F.3d 127, 129-30 (1st Cir. 2015) (explaining that plaintiff must show "that age was the but-for cause of the employer's adverse action"). At the summary judgment stage, the plaintiff must simply "offer some minimally sufficient evidence, direct or indirect, both of pretext and of [the employer's] discriminatory animus." Acevedo-Parrilla v.

<u>Novartis Ex-Lax, Inc.</u>, 696 F.3d 128, 140 (1st Cir. 2012) (emphasis and quotation omitted).

At this step, the court is not concerned with whether the stated purpose "is unwise or unreasonable." <u>Woodward</u>, 714 F.3d at 639. "Instead, [the plaintiff] must show that the stated purpose is untruthful." <u>Id.</u> "Courts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions." <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 825 (1st Cir. 1991).

That said, courts must be "particularly cautious" about granting an employer's motion for summary judgment where a plaintiff has made out a <u>prima facie</u> case of age discrimination, such that the issue is whether the employer's stated reason is pretext for discrimination. <u>Soto-Feliciano v. Villa Cofresi Hotels, Inc.</u>, 779 F.3d 19, 25 (1st Cir. 2015) (quoting <u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151, 167 (1st Cir. 1998); <u>see also</u> <u>Acevedo-Parrilla</u>, 696 F.3d at 140 ("[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent.").

## II. <u>Termination Claim</u>

### 1. *McDonnell Douglas* Step One

#### a. Parties' Arguments

Defendants argue that Fife cannot establish a prima facie case of age discrimination because his claim rests only on a "personal belief" that he would have remained employed but for his age. Docket No. 100 at 12. Plaintiffs retort that a jury could "easily conclude that while decisions were being made about [Fife's] retention or termination, decision makers and human resources personnel were routinely discussing their seemingly universal expectation that Mr. Fife would shortly retire and relying on same in connection with deciding to terminate him." Docket No. 109 at 21.

  b. Analysis

Both parties agree that Fife has satisfied the first three prongs of the first step of the McDonnell Douglas framework.

As to the fourth prong, the parties disagree as to whether a jury could reasonably conclude that MetLife did not treat age neutrally while implementing the RIF. Tompkins testified that he believed in 2016 that Fife would retire within twelve to eighteen months. The record contains evidence that Tompkins worked closely with Lambert, Cox, and members of MetLife's HR team to plan and implement the RIF from March 2016 onward. Multiple emails, text messages, and handwritten notes created by Tompkins, Cox, and MetLife's HR employees during June and July 2016 link Fife to a twelve-to-eighteen-month time horizon. Taken together, this evidence is sufficient to create a genuine

dispute of material fact as to whether Fife's retirement timeline played a substantial role in the decision to terminate him.

*2. Step Two*

The parties agree that Defendants have met their burden of production under step two of the <u>McDonnell Douglas</u> framework. MetLife has articulated legitimate, nondiscriminatory reasons for its termination of Fife. Regarding Cox, MetLife has produced evidence that Cox did not retain Fife as a DSM because she considered him to be aggressive and contrarian, and therefore not a good fit for the Brighthouse team.  Regarding Tompkins, MetLife has produced evidence that Tompkins' decision was based upon financial considerations, because Fife had a higher salary than other members of the SRM team.

*3. Step Three*

    a. Parties' Arguments

The Defendants argue that, because the pretext inquiry should focus "on the motivations and perceptions of the actual decisionmaker," <u>Bennett v. Saint-Gobain Corp.</u>, 507 F.3d 23, 31 (1st Cir. 2007), only Cox's motivations are relevant to Fife's termination claim. The Defendants contend that Fife has failed to produce any evidence that Cox's proffered reason for terminating Fife was pretext for age discrimination.

The Plaintiff's pretext-related arguments focus on MetLife as a whole, rather than Cox alone. The Plaintiff rests his claim of pretext on three grounds: (i) the shifting explanations offered by Defendants for his termination, (ii) comments by his colleagues that he was close to retirement, and (iii) the inaccurate OWBPA list that MetLife provided him upon his retirement.

b. Analysis

i. "Actual decisionmaker"

Though the pretext inquiry focuses "on the motivations and perceptions of the actual decisionmaker," Bennett, 507 F.3d at 31, plaintiffs can establish pretext by showing that discriminatory comments were made by "those in a position to influence the decisionmaker." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (denying summary judgment because a non-decisionmaker who made discriminatory comments held "almost daily conference calls" with the decisionmaker during relevant time period and was asked for his opinion regarding the plaintiff's dismissal). Cf. Bennett, 507 F.3d at 31 ("Statements made by those who are not involved in the decisional process normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.").

Here, Cox, Tompkins, and Lambert could all be considered "actual decisionmaker[s]" in the decision to terminate Fife. Lambert led a "core group" of individuals, including Cox and Tompkins, to create the RIF strategy. The Defendants themselves have identified Cox and Lambert as two individuals involved in the decision to terminate Fife. Docket No. 62-2 at 17-18 ("Myles Lambert and Melissa Cox, in consultation with Human Resources and Legal, were involved in the decision to eliminate Plaintiff's position."). Even if Tompkins is not considered an "actual decisionmaker," a reasonable juror could infer that Tompkins was in a position to influence Cox and Lambert.

The Defendants raise additional arguments regarding Cox's state of mind. They argue, for example, that none of the documentary evidence in the record links Fife's purported twelve-to-eighteen-month timeline to Cox's decision regarding the DSM position. The Defendants also point to Cox's claim that she understood the twelve-to-eighteen-month timeline to refer to Fife's possible service as a consultant for Brighthouse. Credibility determinations regarding pretext, motive, and intent are properly left for trial, however. See Acevedo-Parrilla, 696 F.3d at 140. A jury could reasonably believe that both Cox and Tompkins decided to exclude Fife from their teams because of his proximity to retirement.

    ii.  Shifting explanations

An employer's "shifting explanations" for an adverse employment action can support a finding of pretext. Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 449 (1st Cir. 2009) (concluding that a jury could find pretext where an employer had offered no reason for the plaintiff's discharge at the time of his termination, then offered one reason in a state agency proceeding, followed by a different reason in a judicial proceeding). A plaintiff can establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." Santiago-Ramos, 217 F.3d at 56 (quotation omitted). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). Thus, "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) (emphasis omitted).

Here, the Defendants have offered at least five reasons for Fife's termination. During Fife's termination call on August 5, 2016, Cox explained that Fife was terminated because his position had been eliminated. On March 21, 2017, in response to Fife's EEOC charge, the Defendants claimed they had to choose

between Fife and Weingartner for a single DSM position in the Northeast, and Fife lost. Lambert undermined this rationale during his deposition, stating that he did not "recall that being the situation." Docket No. 114 at 57 (Lambert Tr. 69:21-70:1). Cox also testified that she could have continued to employ both Fife and Weingartner. On June 22, 2017, in response to another employee's Iowa Civil Rights Commission charge, Defendants stated that they "decided to keep the DSMs with the strongest point of sale experience." Docket No. 119 at 4. Lambert later testified that he didn't believe that to be a true statement. On March 29, 2018, Cox stated that Fife was terminated because he was "aggressive" and "contrarian." Docket No. 116 at 17 (Cox I Tr. 57:11-21). On September 7, 2018, Tompkins explained that he did not include Fife in the SRM team because Tompkins did not want to insult Fife by asking him to take a reduction in salary.  A jury might reasonably conclude that these shifting justifications indicate that the Defendants' asserted legitimate reasons were pretextual.

   iii. Retirement comments

  Defendants insist that workplace comments related to retirement are not necessarily evidence of age-based discrimination. Defendants cite several cases in support of their argument that MetLife was engaged in legitimate succession planning, rather than unlawful age discrimination. It is true

that employers are permitted to "gather information relevant to personnel planning without raising the specter of age discrimination." <u>Wallace v. O.C. Tanner Recognition Co.</u>, 299 F.3d 96, 100 (1st Cir. 2002). Similarly, no inference of discrimination arises from "offer[s] of early retirement," <u>Acevedo-Parilla</u>, 696 F.3d at 147, or "brief, stray remarks [about retirement] unrelated to the termination decisional process." <u>Wallace</u>, 299 F.3d at 100.

Defendants' retirement-related discussions about Fife do not fall into any of these categories, however. During the RIF, Defendants did not ask Fife about his retirement plans or offer him early retirement. <u>Cf.</u> <u>Wallace</u>, 299 F.3d at 99 (finding legitimate succession planning where employer had asked plaintiff about his retirement plans); <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d 63, 69-70 (1st Cir. 2002) (finding retirement-related comments nondeterminative where neither the speaker nor the listener had played a meaningful role in termination decision).

Furthermore, the Defendants' references to Fife's retirement exceeded stray remarks. Here, both Tompkins and MetLife's HR employees made repeated mention of Fife's retirement timeline over June and July 2016, in the context of discussions on whether to terminate Fife's employment. Cox also memorialized at least one of those discussions in writing. Thus, there is a genuine dispute of material fact as to whether the

discussions reflected legitimate succession planning or impermissible age discrimination.

        iv.   Incomplete OWBPA list

Fife also argues that MetLife's failure to include younger workers on the OWBPA disclosure list evidences pretext. To waive an employment discrimination claim under the ADEA, an employer must provide a terminated employee with OWBPA documents that properly identify the job titles and ages of all individuals selected for termination and the job titles and ages of individuals in the same job classification or organizational unit who were not terminated. 29 U.S.C. § 626(f)(1). The OWBPA "is designed to protect the rights and benefits of older workers," and "implements Congress' policy via a strict, unqualified statutory stricture on waivers." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998). Accordingly, employees may not waive ADEA claims "unless the employer complies with the statute." Id.

Fife contends that MetLife's OWBPA disclosure incorrectly omitted four individuals that were part of the "decisional unit" associated with his termination. MetLife's list included Fife (age 64), Vernon Carlson (age 42), David Weingartner (age 58), Ronald Rovner (age 53), Jim Wanek (age 48), Tien Nguyen (age 36), and Karen Creel (age 45). It did not include Lauren Davis (age late 30s or early 40s), Jordan Teel (age 34), Brandon Fisk

23

(late forties), or Steve Sugumele (early forties), who were all considered for DSM positions at Brighthouse. Fife argues that, after viewing the OWBPA waiver that MetLife provided, a jury could reasonably conclude that Davis, Teel, Fisk, and/or Sugumele were excluded in an effort by Defendants to hide the age bias in their reduction in force.

MetLife's faulty OWBPA waiver is not conclusive evidence of age discrimination by itself, though it may be considered by the jury alongside other evidence of age discrimination. "Virtually every court that has decided the issue of whether a violation of the OWBPA, by itself, establishes age discrimination has concluded that it does not." EEOC v. UBS Brinson, Inc., No. 02-cv-3745, 2003 WL 133235, at *3 (S.D.N.Y. Jan. 15, 2003); see also Commonwealth v. Bull HN Info. Sys., 143 F. Supp. 2d 134, 158 (D. Mass. 2001) (noting that "although violation of the OWBPA invalidates a waiver . . . the same violation does not itself entitle [a plaintiff] to damages in the absence of substantive age discrimination"). The jury may consider the OWBPA list alongside evidence that the Defendants made retirement-related comments and offered shifting reasons for Plaintiff's termination.

**B. Separate Consideration of SRM and DSM Positions**

MetLife argues that the decisionmaking processes related to the SRM and DSM positions must be considered separately. Using

this framework, MetLife contends that Fife has raised a new failure-to-hire claim (for the SRM position) that is separate from his termination claim. MetLife argues that this "new" claim must be dismissed because (1) it was not raised in Fife's administrative charge or civil complaint, and (2) it fails on the merits.

The Defendants' proposed bifurcation of the DSM and SRM decisionmaking processes is unsupported by the evidence. As noted by this Court in June 2019, Fife has sought relief "only against MetLife, not against Ms. Cox or Mr. Tompkins individually." Docket No. 89 at 2. Fife listed MetLife as the sole defendant in both his EEOC charge and civil complaint. Fife also described both his DSM and SRM duties in his EEOC charge, and explained in his civil complaint that "at all material times, [he] served two roles within the wholesale distribution business." Docket No. 1 ¶ 27.

The recent round of discovery supports considering Fife's termination as the result of a single process that included both Cox's and Tompkins' decisions, rather than of two separate processes. Tompkins worked closely with Lambert and Cox during the RIF. At the very start of the process, in March 2016, Lambert convened an offsite meeting for a "core group" that included Cox and Tompkins. Docket No. 114 at 12. That group was tasked with determining the future of the third-party life

insurance team. Id. The group operated under a non-disclosure agreement, and exchanged frequent emails, phone calls, and text messages regarding the RIF over the course of the summer of 2016.

The record indicates that Cox and Tompkins were involved in a joint "strategy" for the reorganization, Docket No. 98-1 at 2. Tompkins and Cox jointly agreed that, as of July 15, Fife would be considered for a role on the SRM team, rather than the DSM team. Even after that date, Tompkins communicated about the possibility of Fife performing both his DSM and SRM duties. See Docket No. 98-9 (Tompkins email to Lambert, dated July 26) (explaining that retaining Fife as a consultant could allow Brighthouse "to transition the HSBC relationship [which fell under Fife's DSM duties] as well as the firm recruitment responsibilities [which fell under Fife's SRM duties] over a 12-18 month period").

Given the close coordination of Lambert, Cox, and Tompkins during the RIF, Fife "is not introducing a new theory of liability in referencing [Tompkins'] remarks. He is merely augmenting the evidentiary basis for the very same age discrimination claim that he had already sufficiently pled." Soto-Feliciano, 779 F.3d at 26. Fife has not raised a new claim.

## **ORDER**

MetLife's renewed motion for summary judgment (Docket No. 96) is **DENIED**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge